UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| HENMAN ENGINEERING AND MACHINE, INC.,<br>THOMAS HENMAN, SR,<br>THOMAS HENMAN, JR, | )<br>)<br>)<br>) |
| Plaintiffs, | )<br>)<br>) |
| v. | )     No. 1:17-cv-00701-SEB-TAB |
| JUSTIN D NORMAN, | )<br>)<br>) |
| Defendant. | )<br>) |
| JUSTIN D NORMAN, | )<br>)<br>) |
| Counter Claimant, | )<br>) |
| v. | )<br>) |
| THOMAS HENMAN, JR,<br>THOMAS HENMAN, SR,<br>HENMAN ENGINEERING AND MACHINE, INC., | )<br>)<br>)<br>) |
| Counter Defendants. | )<br>) |

**FINDINGS OF FACTS AND CONCLUSIONS OF LAW FOLLOWING BENCH TRIAL**

This case came before the Court for a bench trial on August 17, 2020. The underlying dispute involves the execution of an asset purchase agreement, which ultimately left all parties dissatisfied. Competing breach of contract claims were alleged. Having heard and now carefully considered the evidence, the Court finds that Defendant Justin D. Norman is liable for a breach of contract, having failed to satisfy his contractual

1

obligation to timely pay the final purchase price pursuant to the parties' agreement. The Court further concludes that Plaintiffs have committed no breaches of contract as alleged by Defendant. Accordingly, the following findings of fact and conclusions of law are entered herewith.

## I.   Procedural Background

On March 8, 2017, Plaintiffs initiated this litigation against Mr. Norman and four limited liability companies bearing his name: JD Norman Muncie, LLC; JD Norman Winchester LLC; JD Norman Muncie Building, LLC; and JD Norman Winchester Building, LLC. Plaintiffs alleged a single breach of contract claim as well as an alternative unjust enrichment claim against the defendants collectively. In addition, a second breach of contract claim was brought by Plaintiffs against the corporate entity defendants. On May 18, 2017, Defendants filed a Counterclaim alleging fraudulent inducement, breach of contract, and unjust enrichment. Plaintiffs' amended complaint, filed on December 26, 2017, reasserted their claims buttressed by averments relating to a subject matter jurisdiction issue.[1] On December 11 2018, the Magistrate Judge granted Defendants' request to file an Amended Counterclaim, which omitted all claims of fraud but added new breach of contract and unjust enrichment claims.

At the commencement of the final pre-trial conference conducted by the undersigned judge on July 28, 2020, the Court was notified by the parties that a

---

[1] We have previously determined that this matter is properly before the Court pursuant to 28 U.S.C. § 1332; the parties are completely diverse and the amount in controversy exceeds $75,000, exclusive of costs and interests.

2

settlement had been reached between Plaintiffs and the four limited liability companies. These defendants thereafter filed consent judgments on August 7, 2020, admitting liability as to each of Plaintiffs' claims.

A bench trial was held in this case on August 17, 2020, at which Mr. Norman was the sole defendant remaining in this litigation. Plaintiffs were represented by Matthew L. Kelsey and Scott E. Shockley from Defur Voran, LLP in Muncie, Indiana.  Defendant appeared *pro se.* Plaintiffs called four witnesses. Defendant called one witness in addition to himself. At the conclusion of trial, the Court took under advisement a final decision and requested the filing of proposed findings of facts and conclusions of law from both parties. This Order reflects and embodies the Court's final decisions on all pending issues of fact and law.

## II.     Findings of Fact

Henman Engineering & Machine, Inc. ("Henman Engineering") was an Indiana corporation with its principal place of business in Muncie, Indiana. Plaintiffs Thomas Henman Sr. and Thomas Henman, Jr. were the sole living, original shareholders of Henman Engineering. Mr. Henman, Sr. started the company with his wife, now deceased, in 1978. Mr. Henman, Jr. joined the business sometime thereafter.

Under the management of the Henman family, Henman Engineering was a manufacturer of parts for the automotive industry, primarily servicing two clients: Borg Warner, Inc. ("Borg Warner") and Mahle. Mr. Henman, Sr. testified at trial that Henman Engineering was "generally successful" throughout its nearly thirty years of operation; it

had always maintained good relationships with its lenders, and, though it had faced some

financial challenges during the 2008 recession, it had remained profitable over the years.

Sometime in late-2014, the Henmans decided to put their company up for sale. Mr.

Henman, Sr. testified that the decision was not linked to any concerns related to the

company's viability. Rather, because Mr. Henman, Sr. was then in his late-seventies and

his son was also approaching retirement, and Mrs. Henman was battling terminal cancer,

which would leave the business without any family members to manage it, the Henmans

decided to sell Henman Engineering.

The Henmans engaged True North Strategic Advisors of Fort, Wayne, Indiana

("True North") to provide business brokerage services in connection with the sale. True

North had complete access to Henman Engineering's financial records and accounting

documents in serving as its consultant. Utilizing this information, True North produced a

forty to fifty page circular to advertise the company and outline its financial status for

potential buyers. True North also uploaded all of Henman Engineering's financial

documents into a virtual data room for access by potential purchasers. Monte Lightner, an

attorney and certified public accountant, served as Plaintiffs' primary liaison at True

North.

True North eventually identified Mr. Norman and his company, J.D. Norman

Industries, Inc ("JDNI") as a potential buyer, based on Mr. Norman's inquiries and

expressions of interest. Though the Henmans initially believed that JDNI would be the

sole purchaser of Henman Engineering, Mr. Norman ultimately formed his four limited

liability companies for purposes of entering into the transaction. Throughout 2015, the

parties participated in negotiations relating to the sale of Henman Engineering to the J.D. Norman limited liability companies, who would purchase substantially all of Henman Engineering's assets. Mr. Norman undertook extensive due diligence investigations relating to the purchase. As the potential purchaser, he was allowed full access to True North's virtual data room, which contained the complete collection of Henman Engineering's financial records. Mr. Norman also employed an independent accounting firm, Plante Moran, to assist in performing this due diligence. Plante Moran's accountants were granted full access to Henman Engineering's financial records during the due diligence examination. Mr. Norman's lending bank, Bank of America, conducted its own review of Henman Engineering's financial records.

Mr. Norman was also allowed to physically inspect Henman Engineering's facilities prior to the final sale. This included a visit by Mr. Norman and a representative of Bank of American to the Henman Engineering facility in Muncie, Indiana to personally inspect the building and its inventory. Mr. Henman, Sr. and Mr. Norman together also visited Borg Warner in 2015. As Mr. Henman, Sr. testified at trial, which was consistent with Mr. Norman's deposition testimony,[2] a representative of Borg Warner expressed its pleasure over the purchase of Henman Engineering by the JD Norman entities. There was no indication during this visit that Borg Warner would be reducing its business with Henman Engineering in the foreseeable future.

---

[2] Excerpts of Mr. Norman's deposition testimony were admitted without objection.

Following the completion of the due diligence, the four J.D. Norman limited liability companies finalized the purchase of substantially all the assets belonging to Henman Engineering, including the company's real estate, inventory, machinery, and receivables. To effect the transaction, on January 25, 2016, these JD Norman limited liability companies entered into an Asset Purchase Agreement (the "Agreement") with Henman Engineering. At the time of sale, Henman Engineering had approximately 150-170 employees. Mr. Henman, Sr., testified that Henman Engineering was not subject to any containment obligations at the time of the sale that required the company to hire third parties to ensure quality control.

The Agreement contained the following provision with respect to Mr. Norman's personal liability:

> Justin D. Norman, in his individual capacity ("JDN"), hereby unconditionally and irrevocably guarantees for the benefit of Seller, the collection of full payment, as and when due, of the Purchaser EBITDA Adjustment Payments. The guaranty set forth in this Section 8.11 is a guaranty of collection, not payment and an action or actions to enforce this guaranty may only be brought and prosecuted against JDN to the extent that Seller has first proceeded against Purchaser; provided, however, in the event (and solely in the event) that Purchaser is unable to pay any Purchaser EBITDA Adjustment Payments pursuant to [Section 4.4] for a period of more than thirty (30) days following the due date of any such payment, then Seller may proceed directly against JDN notwithstanding JDN's guaranty of collection set forth in this Section 8.11. The guaranty set forth in this Section 8.11  shall automatically terminate, without any further action of the parties hereto, upon the final payment of the Purchaser EBITDA Adjustment Payments, if any.

[Agreement, at § 8.11].

Pursuant to the terms of the Agreement, the base purchase price for Henman Engineering was $11,000,000, subject to an adjustment to be calculated following closing based on the company's 2015 earnings before income, tax, depreciation and

6

amortization ("EBITDA"). [Agreement, at § 4.4(a)]. The base purchase price was to be

decreased or increased depending upon the "Final EBITDA" calculation as of December

31, 2015. If the Final EBITDA was higher or lower than $2,750,000, then the purchase

price would be adjusted accordingly and referred to as the "EBITDA Adjusted Purchase

Price." Specifically, any difference in those amounts was to be multiplied by four and

added to or subtracted from the base purchase price. [*Id.*]. At closing, the base purchase

price of $11,000,000 was paid by the JD Norman entities to Plaintiffs.

Consistent with Section 4.4(b) of the Agreement, Plaintiffs' accountant was

directed to prepare financial statements for Henman Engineering as of the close of

business on December 31, 2015. Section 4.4(b) provides, in full:

> The Seller's Accountant shall prepare the 2015 Financial Statements and the
> Final EBITDA in accordance with the same policies and procedures used to
> prepare the Reviewed Financial Statements and in accordance with the
> definitions and adjustments set forth in the Agreement (including the
> adjustments identified on Schedule 1.1(k)). Promptly, but in no event later than
> the date that is the later of (i) April 30, 2016 and (ii) five (5) Business Days
> following Seller's receipt of the 2015 Financial Statements, Seller shall deliver
> to Purchaser the 2015 Financial Statements, together with a certificate setting
> forth the final EBITDA and any adjustments, based on the Final EBITDA, to
> the Base Purchase Price. If Purchaser does not object to the 2015 Financial
> Statements, Final EBITDA or the EBITDA Adjusted Purchase Price within
> thirty (30) days after receipt, or accepts such items in writing during such thirty
> (30) day period, the 2015 Financial Statements and the Final EBITDA
> prepared by the Seller's Accountant and the EBITDA Adjusted Purchase Price
> set forth in such certificate shall become final and binding upon the parties
> hereto on the thirty-first (31st) day following receipt thereof by Purchaser, and
> the Base Purchase Price will be adjusted as set forth in Seller's certificate, and
> payment will be made in accordance with Section 4.4(d).

Ben Smith, a certified public accountant and the CEO of Estep Doctor & Co

("Estep"), served as the primary accountant for Henman Engineering from the time the

business was created through the closing of the sale. In that capacity, he worked primarily with Mr. Henman, Jr., who managed Henman Engineering's financials. Mr. Smith testified that he never doubted the accuracy of the financial information provided to him by Mr. Henman, Jr. Mr. Henman, Jr. testified that he always maintained accurate financial records for the company.

As required by the Agreement, Mr. Smith prepared the final financial statements using the same accounting policies and practices utilized by Henman Engineering throughout its corporate history. According to Mr. Smith, the accounting practice he employed for Henman Engineering is the generally accepted accounting principle known as the "direct write-off method," pursuant to which receivables are written off when management believes them to be uncollectible. This method requires an exercise of judgment by management in order to determine, based upon its experience with customers, when a particular debt is or becomes uncollectible.

Mr. Smith explained that this approach worked reliably over the years because Henman Engineering had relatively few customers, all of whom almost always paid their bills, even if payments were occasionally delayed. For example, at the end of 2015, Henman Engineering was carrying some receivables with its customer, Mahle, that were overdue by approximately six months. Henman Engineering elected not to write them off based on their experience with Mahle that the company was at times a slow payor but eventually paid its obligations in full. Therefore, at the time of the sale of the business, Plaintiffs were not concerned that the Mahle debts would ultimately be uncollectible.

Mr. Smith further testified that neither Plante Moran nor any representative of Mr. Norman or his companies ever questioned this accounting methodology during the due diligence period, despite having a full awareness of it. In fact, this methodology was acknowledged without objection in Plante Moran's quality earnings report to Mr. Norman following the close of the due diligence period. John Samulak, the Plante Moran principal responsible for this report, testified at his deposition that the direct write-off method was an acceptable methodology for Henman Engineering, and that Plante Moran did not recommend adopting a different accounting methodology.[3]

Mr. Smith had calculated the Final EBITDA to be $3,854,328.00, an amount that exceeded the anticipated EBITDA by $1,104,328.00. By quadrupling this figure, the EBITDA Adjusted Purchase Price increased by $4,417,312.00. Pursuant to Section 4.4(c) of the Agreement, these calculations were to be conveyed to Mr. Norman and his entities in a "certificate" no later than April 30, 2016. Following receipt of the "certificate,"[4] the purchasers had thirty days within which to submit written objections to Plaintiffs' calculations; otherwise, Plaintiffs' Final EBITDA and the corresponding EBITDA Adjusted Purchase Price would become final and binding on the parties. The Agreement further provided that if the parties were unable to resolve any disputes arising from the purchasers' objection(s), the dispute was to be referred to the independent accounting firm identified in Section 1.1(x) of the Agreement.

---

[3] Excerpts of Mr. Samulak's deposition testimony were admitted without objections.
[4] What meaning is appropriately given to the term "certificate" is a question we take up in our legal analysis

On March 15, 2016, Plaintiffs engaged Mr. Lightner to transmit the 2015 reviewed, finalized financial statements along with the Final EBITDA calculation and the EBITDA Adjusted Purchase Price to Mr. Norman's representative, who in turn forwarded the documents to Mr. Norman. At trial, Mr. Norman testified that he received the March 16, 2016 financial documents and acknowledged his contractual right to object as well as his understanding of the dispute resolution process outlined in the Agreement. He claimed, however, that he could not recall whether he or any of his representatives submitted any written objections to the 2015 reviewed financial statements, the Final EBITDA figure, or the EBITDA Adjusted Purchase Price, or to the form in which these materials were provided to him within the thirty-day window following their receipt. In contrast, Mr. Henman, Sr., Mr. Smith, Mr. Lightner, and Mr. Chris Goeglien (the managing principal at True North who also assisted with the execution of the sale) each testified that none of these materials was challenged in any manner within the thirty days following Mr. Norman's receipt thereof.

According to Section 4.4(d) of the Agreement, payments by the JD Norman entities toward the EBITDA Adjusted Purchase Price were to commence on June 30, 2016 in nineteen equal monthly installments. Mr. Norman requested, and Plaintiffs granted, an initial extension of thirty days, thus delaying the start of payments to July 30, 2016, making the final payment due by January 31, 2018. Section 4.4(d) of the Agreement also states that an interest rate of seven percent per annum is to be applied to all past due payments.

10

It is undisputed that Plaintiffs have received no payments from Mr. Norman or his entities towards the EBITDA Adjusted Purchase Price, which amount became due in full on January 31, 2018.

### III.    Conclusions of Law

The parties have admitted execution of the Agreement,[5] which contains a choice of law provision requiring that the Agreement be construed in accordance with Delaware law.[6] To prevail on a claim for breach of contract under Delaware law, a  party must establish by a preponderance of the evidence that: (1) a contract existed between the parties; (2) the defendant breached an obligation imposed by the contract, and (3) the plaintiff suffered damages as a result of the breach. *Veltre v. Keener*, 2018 WL 323830, at *3 (Del. Com. Pl. Jan. 5, 2018).  The interpretation of a contract is a question of law to be determined by the court. *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1158 (Del. 2010)

---

[5] The parties' pleadings were admitted without objection at trial as judicial admissions establishing pursuant to both parties' stipulations that the Agreement is an enforceable contract under Delaware law.

[6] "Federal courts sitting in diversity must look to the conflict-of-laws rules of the forum state for the applicable substantive law." *Jupiter Aluminum Corp. v. Home Ins. Co*., 225 F.3d 868, 873 (7th Cir. 2000). Under Indiana law, where, as here, the parties stipulate in their contract as to what law governs, courts are to apply the law of the forum chosen by the parties. *Kentucky Nat. Ins. Co. v. Empire Fire & Marine Ins. Co*., 919 N.E.2d 565, 575 (Ind. Ct. App. 2010)

When interpreting a contract under Delaware law, "the Court must view the document as a whole, giving effect to all of its provisions," *Interim Healthcare, Inc. v. Spherion Corp.*, 884 A.2d 513, 556 (Del. Super. Ct.), aff'd, 886 A.2d 1278 (Del. 2005), and "will construe clear and unambiguous terms according to their ordinary meaning." *Murphy v. Pentwater Capital Mgmt*. LP, 2019 WL 3545850, at *3 (Del. Super. Ct. July 24, 2019). The Court "examine[s] the entire agreement to determine whether the parties' intent can be discerned from the express words used or, alternatively, whether its terms are ambiguous." *Comrie v. Enterasys Networks, Inc*., 837 A.2d 1, 13 (Del. Ch. 2003).

Ambiguity in a contract exists "when the provisions in controversy are reasonably or fairly susceptible of different interpretations." *VLIW Tech., LLC v. Hewlett-Packard Co*., 840 A.2d 606, 615 (Del. 2003). If the Court determines that a contract's terms are ambiguous, "it may consider extrinsic evidence to uphold, to the extent possible, the reasonable shared expectations of the parties at the time of contracting." *Comrie*, 837 A.2d at 13 (Del. Ch. 2003).

A. <u>Mr. Norman's Personal Liability</u>

The Court concludes that Mr. Norman is personally liable for any remaining portion of the purchase priced owed to Henman Engineering under Section 4.4(b) of the Agreement, in accordance with his personal guaranty in Section 8.11. This Section provides that Mr. Norman guaranteed collection of the EBITDA Adjusted Purchase Price owed by the entity defendants, who were the purchasers under the Agreement. This Section further states that if the entities are unable to pay the EBITDA Adjusted Purchase Price payments for a period of more than thirty days from the date the payments are due,

12

then Plaintiffs may proceed directly against Mr. Norman personally in pursuit of payment. The guaranty terminates "upon the final payment" of the EBITDA Adjusted Purchase Price payment. It is undisputed that Plaintiffs have not collected the full payment, which was due in full on January 31, 2018.

Mr. Norman introduced no evidence or testimony at the trial to establish that this provision—which meaning is easily discernable based on its plain language—was vague, ambiguous, or otherwise unenforceable. Though he has expressed his personal belief that he "fairly assumed and understood [that] his obligations as a secondary guarantor were extinguished with the settlement between the Plaintiffs and the [entity defendants]," he has presented no factual or legal basis for this belief, nor does such a belief comport with any reasonable interpretation of the terms of the personal guaranty. Therefore, we hold that Plaintiffs are entitled to proceed directly against Mr. Norman personally to recover on their breach of contract claim.

B. Plaintiffs' Breach of Contract Claim

Plaintiffs have alleged that Mr. Norman breached Section 4.4(b) of the Agreement by failing to make any payments towards the EBITDA Adjusted Purchase Price of $4,417,312.00, which amount constitutes Plaintiffs' damages. As previously stated, Section 4.4(b) provides that "Seller shall deliver to Purchaser the 2015 Financial Statements, together with a certificate setting forth the Final EBITDA and any adjustments, based upon the Final EBITDA, to the Base Purchase Price." The Agreement also provides for a thirty-day window to interpose any objections to these documents

before the Final EBITDA and the EBITDA Adjusted Purchase Price become "final and binding."

There is no evidence that Mr. Norman or any of his affiliates objected within this time frame; indeed, the evidence establishes that no objections to these financial documents were articulated until they were set out in the Amended Counterclaim on September 19, 2018—30 months following the production of the Final EBITDA.

Mr. Norman's primary defense throughout this litigation has been that Plaintiffs provided the Final EBITDA calculation in an improper form. Specifically, Mr. Norman has maintained that Plaintiffs failed to provide a "certificate," as required by Section 4.4(b) of the Agreement. Mr. Norman failed to develop this defense at trial, however, in response to Plaintiffs' introduction of evidence establishing their contractual compliance.

During cross-examination of Mr. Norman, he was asked if he maintains that the form of the Final EBITDA calculation as delivered to him was deficient or otherwise not in compliance with the contract, in which case whether he believes he was obligated to file a written objection within the thirty-day period provided for in the Agreement. To the extent Mr. Norman contends he was not so required, we are unpersuaded. Section 4.4(b) does not qualify or limit the nature of any perceived deficiencies with Plaintiffs' final financial documents that must be raised in a written objection within the thirty-day window for purposes of avoiding any waiver thereof. The clear intent of Section 4.4(b), based on its plain language, is to provide clarity and finality, with some degree of promptness, to the final calculation of the purchase price and the payout of that amount. This Section, for example, specifies that the parties are to confer about objections and, if

14

they cannot resolve their differences, the dispute was to be submitted to the agreed-upon independent accounting firm. This language embodies the parties' intent to conclusively resolve any disputes over the Final EBITDA calculation within a few months, not years later.  Claiming that certain objections—for example, Mr. Norman's objection related to the form in which the Final EBITDA calculation was delivered—were not required to have been raised within the thirty-day objection period frustrates the parties intent to promptly resolve any issues regarding the calculation of the final purchase price.

Even considering Mr. Norman's objection to Plaintiffs' form of delivery, we are unpersuaded that the Final EBITDA was not, in fact, delivered in the form of a "certificate" within the meaning of Section 4.4(b). The Agreement does not contain any definition of "certificate," nor does Section 4.4(b) provide an example of what such a "certificate" would look like. Plaintiffs' accountant, Mr. Smith, a CPA with several decades of accounting experience, and Mr. Lightner from True North, an attorney and CPA experienced in transactions such as the one before us here, testified that they were not familiar with the term "certificate," or with it having any particular meaning in a document such as the Agreement.

Mindful that interpretation of a contract requires reading and harmonizing the provisions within in the document as a whole, we note that Section 4.3 of the Agreement, which immediately precedes Section 4.4, also requires that a "certificate" be delivered, but provides an example of such a form. Section 4.3, like Section 4.4, deals with the reconciliation of final accounting matters in the context of the sale as well as the transfer of funds between the parties depending upon whether the calculation of working capital

15

delivered by Plaintiffs at closing turned out to be greater or less than an assumed number. In contrast to Section 4.4, where Plaintiffs retained responsibility for producing the proposed final calculation, in Section 4.3 the purchaser was assigned that duty. The method for delivery of a proposed calculation (i.e., a thirty-day period within which to object, and a referral of any dispute to the identified independent accounting firm) is substantially identical in both sections. Section 4.3's illustration of a "certificate" thus informs our analysis of the parties' intention with respect to that term.

Section 4.3(c) imposed on the purchasers the duty to prepare a "Revised Closing Statement" in a "certificate" in accordance with the form of Exhibit A to the Agreement. Exhibit A is a standard accounting spreadsheet. *See* Pl. Exhibit 60. What Mr. Norman's representative produced in order to comply with this "certificate" requirement was an accounting spreadsheet mirroring the form of Exhibit A. *See* Pl. Exhibit 61. Thus, in light of the foregoing provisions of the contract, we conclude that the term "certificate," as used in the Agreement, means an accounting spreadsheet, such as the one referenced in Exhibit A to the Agreement.

Having resolved that issue, there is no dispute that Estep's Final EBITDA calculation was delivered in an accounting spreadsheet that was in substantially the same form to the spreadsheet reflected in Exhibit A. It is also consistent in form with the spreadsheet produced by Mr. Norman's representatives when they satisfied his "certificate" obligation under Section 4.3(c). *Compare* Pl. Exh. 61 *with* Pl. Exh. 62. Accordingly, we hold that the form of Exhibit 62, which contains the Final EBITDA calculation submitted by Plaintiffs to Mr. Norman, qualified as a certificate within the

16

context and meaning of the Agreement. Plaintiffs thus  complied with their contractual duty regarding the format of the Final EBITDA calculation. We reject Mr. Norman's (much belated) objection to Plaintiffs' Final EBITDA document and hold that Mr. Norman, by failing to raise a timely objection, waived his contractual right to challenge this calculation. Further, because Mr. Norman failed to interpose an objection  to the Final EBITDA and the corresponding EBITDA Adjusted Purchase Price, these figures must now be deemed final and binding. Having made no payments toward the EBITDA Adjusted Purchase Price after his personal guaranty became effective, Mr. Norman has breached the Agreement and damaged Plaintiffs in the amount of $4,417,312.00.

Accordingly, we hold that Plaintiffs have established by a preponderance of the evidence that Mr. Norman breached his contractual responsibilities. Plaintiffs are entitled to judgment on this claim.

C.  <u>Mr. Norman's Counterclaims</u>

Mr. Norman's Amended Counterclaim alleges four breaches of contract committed by Plaintiffs, each of which claims we address in turn below. Based on our review, we conclude that Mr. Norman submitted insufficient evidence to sustain his burden of proof on any of these claims. In fact, the evidence presented ostensibly in support of these counterclaims actually tended to support Plaintiffs' positions.

1.  *Mr. Norman Has Not Established by a Preponderance of the Evidence that Plaintiffs Materially Misstated the Value of Accounts Receivables*

Mr. Norman has alleged that Plaintiffs materially misstated approximately $309,000 of accounts receivables on the year-end 2015 financials. This counterclaim

appears to be premised on a theory that Plaintiffs and their accountants should have used a different accounting methodology with respect to the way in which Henman Engineering recorded bad debts. The failure to adhere to proper accounting principles drove up the Final EBITDA, says Mr. Norman, who seeks recovery of $309,000 of receivables associated with Henman Engineering's customer, Mahle, which were allegedly aged to a point where payment was unlikely at the date of the closing of the sale transaction. Though we have concluded that Mr. Norman waived his contractual right to challenge the Final EBITDA, we address his counterclaim in this regard.

The undisputed evidence establishes that, throughout its existence, Henman Engineering used the direct write-off method in maintaining its accounts. The undisputed evidence further establishes that the Agreement required Plaintiffs' accountants to prepare the 2015 financials using the accounting method consistent with Henman Engineering's past practices, that is, the direct write-off method. Thus, Henman Engineering's reliance on this method in 2015 was appropriate, given its contractual obligations under the Agreement. Moreover, the evidence establishes that the use of the direct write-off method was an appropriate accounting methodology for a company such as Henman Engineering. Not even Mr. Norman's accountants at Plante Moran challenged the appropriateness of this methodology. Accordingly, Mr. Norman's attempts to challenge the legitimacy of this methodology are devoid of merit.

Additionally, there is no evidence that Plaintiffs or their accountants executed this accounting method in an improper manner. As applied to the specific receivables at issue, the direct write-off method would allow Henman Engineering to write off those

receivables if and when it came to believe they were uncollectible. Whether or not these accounts ever actually proved collectible, however, is irrelevant. The issue is whether Plaintiffs believed these accounts to be uncollectible at year-end such that they should have written them off as bad debts. There is simply no evidence to establish that anyone associated with Henman Engineering knew or should have known that any of the accounts receivable at issue were uncollectible; rather, Mr. Smith's uncontested testimony was that Henman Engineering's experience with Mahle established that it was typically a slow payor, but even so Henman Engineering generally had no problems collecting from it.[7]  There is similarly no evidence that anyone associated with Henman Engineering intentionally misrepresented any of Henman Engineering's financial information to Mr. Norman or his entities or that Henman Engineering's financial records were otherwise inaccurate or that Henman Engineering improperly or inaccurately represented the value of its accounts receivable to Mr. Norman or anyone else.[8]

Lacking any evidence to support this claimed breach, Plaintiffs' defense succeeds on this counterclaim.

> 2.  *Mr. Norman Has Not Established by a Preponderance of the Evidence that He Suffered Any Damages from Plaintiffs' Alleged Breach of the Agreement's Quality Containment & Sorting Obligations*

---

[7] Mr. Norman speculates that Plaintiffs knew that these accounts were not collectable; however, this theory is inconsistent with the witness testimony of Mr. Smith and Mr. Henman, Jr. For example, Mr. Henman, Jr. testified that he was unaware that the accounts were uncollectible until months after the close of the transaction because Mr. Norman either refused or failed to promptly provide the Henmans with financial documents and information so that they could pursue collection of the funds—a right given to them under the Agreement.

[8] The Court also notes that Mr. Norman has not provided any details, never mind evidence, with respect to these receivables, for example, the invoices reflecting the uncollectible accounts and confirming any damages he believes he is owed.

Mr. Norman next alleges in his counterclaims  that Plaintiffs violated Section 8.9(a) of the Agreement, which requires Plaintiffs to reimburse Mr. Norman for any costs incurred by Mr. Norman in connection with any containment or internal sorting measures conducted to assure quality control. At trial, Mr. Norman presented no evidence that he had incurred or suffered any damages resulting from such containment or internal sorting measures.[9] Nor did he present any evidence that Plaintiffs had failed to reimburse him for such costs incurred, in violation of the Agreement. Accordingly, Mr. Norman's breach of contract claim fails for lack of evidence.

### 3.  Mr. Norman Has Not Established that Plaintiffs Failed to Disclose Modification by a Material Customer

Mr. Norman's third breach of contract counterclaim alleges that Plaintiffs failed to disclose prior to closing that Borg Warner, a material customer of Henman Engineering as defined by the Agreement, "intended to reduce materially its business with [Henman Engineering] or "indicated that it intend[ed] to modify its relationship with [Henman Engineering]," in violation of Section 6.21(a) of the Agreement. At trial, Mr. Henman, Sr. testified that he and Mr. Norman visited Borg Warner prior to finalizing the Agreement to confer with a Borg Warner executive regarding the impending sale, during which meeting there was no indication that Borg Warner intended to reduce its business with Henman Engineering. Mr. Norman's own deposition testimony bolsters this defense. Mr. Norman presented no evidence that Henman Engineering failed to disclose any

---

[9] The minimal evidence related to any containment or sorting obligations came from the testimony of Mr. Henman, Sr., who testified that Henman Engineering was not under any sort of containment requirements from its customers as of the date of closing.

information, as required by Section 6.21(a), or that he was damaged by this non-disclosure. Mr. Norman has faltered in meeting his evidentiary burden, requiring judgment to be entered in favor of Plaintiffs on this counterclaim.

### 4.   *Mr. Norman Has Not Established that Plaintiffs Improperly Marked Up Tools*

Mr. Norman next alleges in his counterclaim that, following the execution of the Agreement, he discovered that Henman Engineering had improperly marked up the  costs of tooling to Borg Warner. Such actions, he asserts, violated various portions of the Agreement. Mr. Henman, Sr.'s trial testimony established that Borg Warner consented to the manner in which Henman Engineering invoiced tooling and that Henman Engineering's invoicing and pricing practices were fully disclosed to Mr. Norman and Plante Moran prior to closing. Mr. Norman (again) presented no evidence in support of this claim: there is no evidence that Plaintiffs breached any specific provision of the Agreement or that Mr. Norman suffered damages as a result. Accordingly, judgment shall be entered for Plaintiffs on this counterclaim.

### 5.   *Mr. Norman's Alternative Unjust Enrichment Claim Fails*

Finally, Mr. Norman's amended counterclaim alleges that Plaintiffs have been unjustly enriched by knowingly receiving benefits resulting from their adherence to improper accounting principles, based on their failure to reimburse Mr. Norman for containment and sorting costs as well as their failure to disclose that BorgWarner would

be reducing its business with Henman Engineering, and their improper tooling markups. Having now determined that a valid contract existed between the parties which defined their respective obligations with respect to these allegations, we review Mr. Norman's unjust enrichment claim no further. *See, e.g.*, *Vichi v. Koninklijke Philips Elecs. N.V.*, 62 A.3d 26, 59 (Del. Ch. 2012) (citing *Wood v. Coastal States Gas Corp.*, 401 A.2d 932, 942 (Del.1979) ("Because the contract is the measure of plaintiffs' right, there can be no recovery under an unjust enrichment theory independent of it.") *and* Restatement (Third) of Restitution & Unjust Enrichment § 2 (2011) ("A valid contract defines the obligations of the parties as to matters within its scope, displacing to that extent any inquiry into unjust enrichment.")). Accordingly, Plaintiffs prevail on this claim as well.

## Conclusion

In accordance with these findings of facts and conclusions of law, the Court rules in favor Plaintiffs and against Defendant on Plaintiffs' breach of contract claim. The Court further finds against Defendant and in favor of Plaintiffs on Defendant's four breach of contract counterclaims as well as Defendant's unjust enrichment claim.

IT IS SO ORDERED.

Date: _____9/4/2020_____

_Sarah Evans Barker_

SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Distribution:

JUSTIN D NORMAN
232 N. Lincoln Street
Hinsdale, IL 60521

Matthew L. Kelsey
DEFUR VORAN LLP
mkelsey@defur.com

Scott E. Shockley
DEFUR VORAN LLP
sshockley@defur.com